

FILED

SEP 16 2010

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

(Rev. 5/05)

**FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT**
**UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. §1983**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

(1) Kevin L. Dickens        256 265
(Name of Plaintiff)        (Inmate Number)
James T. Vaughn Correctional Center
1181 Paddock Road
Smyrna, DE  19977
(Complete Address with zip code)

(2) Roman Shankaras    # 376 142

(3) Thomas Gordon    # 455684
(Name of Plaintiff)        (Inmate Number)
James T. Vaughn Correctional Center
1181 Paddock Road
Smyrna, DE  19977
(Complete Address with zip code)

(Each named party must be listed, and all names
must be printed or typed. Use additional sheets if needed)

vs.

(1) Commissioner Carl Danberg

(2) Deputy Commissioner Thomas Carroll

(3) Bureau Chief Rick Kearney
(Names of Defendants)

(Each named party must be listed, and all names
must be printed or typed. Use additional sheets if needed)

:
:
:
:
:
:
:    **10-786**
:
: _____
:    (Case Number)
:    ( to be assigned by U.S. District Court)
:
:
:
:
:
:    **CIVIL  COMPLAINT**
:
:
:
:    Jury Trial Requested
:
:
:
:

## I.  PREVIOUS LAWSUITS

A.    If you have filed any other lawsuits in federal court while a prisoner, please list the caption and case number
including year, as well as the name of the judicial officer to whom it was assigned:

03 - 310 JJF — Judge Joseph Farnan

04 - 210 JJF — Judge Joseph Farnan

## II.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

In order to proceed in federal court, you must fully exhaust any available administrative remedies as to each ground on which you request action.

A.    Is there a prisoner grievance procedure available at your present institution? (•・Yes) •・No

B.    Have you fully exhausted your available administrative remedies regarding each of your present claims?  (•・Yes) •・No

C.    If your answer to "B" is Yes:

   1.   What steps did you take? _Filed Grievances, Wrote Letters and Complaints to Administration, Filed Disciplinary Action and Appeals_

   2.   What was the result? _All grievances, complaints, and disciplinary actions and appeals were denied or ignored._

D.    If your answer to "B" is No, explain why not: _Many grievances were rejected as non-grievable, thus aborting the administrative remedy._

## III.    DEFENDANTS (in order listed on the caption)

(1) Name of first defendant: _Commissioner Carl Danberg_

Employed as _Commissioner_ at _Delaware Dept. of Corrections_

Mailing address with zip code: _Dept. of Corrections, 245 McKee Road, DOVER DE 19901_

(2) Name of second defendant: _Deputy Commissioner Thomas Carroll_

Employed as _Deputy Commissioner_ at _Delaware Dept. of Corrections_

Mailing address with zip code: _Dept. of Corrections, 245 McKee Road, Dover, DE 19901_

(3) Name of third defendant: _Bureau Chief Rick Kearney_

Employed as _Bureau Chief_ at _Delaware Dept. of Corrections_

Mailing address with zip code: _Dept. of Corrections, 245 McKee Road, Dover, DE 19901_

(List any additional defendants, their employment, and addresses with zip codes, on extra sheets if necessary)

2

DEFENDANTS (CONTINUED)

4. Warden Perry Phelps — Warden — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

5. Deputy Warden Pierce — Deputy Warden — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

6. Deputy Warden Klein — Deputy Warden — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

7. Major James Scarborough — Major — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

8. Major Michael Costello — Major — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

9. Captain Rispoli — Captain — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

10. Captain Guy Fowler — Captain — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

11. Captain Carl Hazzard — Captain — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

12. S/Lt. Ramon Taylor — Staff Lieutenant — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

13. S/Lt. Karen Hawkins — Staff Lieutenant — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

14. S/Lt. Willey — Staff Lieutenant — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

15. Lt. Larry Savage — Lieutenant — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

16. Lt. Thomas Seacord — Lieutenant — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

17. Lt. James Satterfield — Lieutenant — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

18. Lt. Paul Harvey — Lieutenant — James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

DEFENDANTS (CONTINUED)

19. Lt. Smith- Lieutenant- James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

20. Lt. Stanley Baynard- Lieutenant - James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

21. Lt. John Salas - Lieutenant- James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

22. Sgt. Wilfred Beckles- Sergeant - James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

23. Sgt. Stanford Henry- Sergeant - James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

24. Lt. Furman- Lieutenant - James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

25. Mike Little - Legal Administrator - James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

26. Brian Engrem - Paralegal- James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

27. Cpl. Frank Kromka- Corporal- James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

28. Cpl. Matthew Dutton- Corporal - James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

29. Cpl. Lise Merson - Corporal - James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

30. Staff Lt. Randall Dotson- Staff Lieutenant - James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

31. Sgt. Roy Foraker- Sergeant - James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

32. Lt. Erick Bayne - Lieutenant - James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

33. Sgt. Jason Coriello- Sergeant - James T. Vaughn Correctional Center
      1181 Paddock Road, Smyrna, DE 19977

DEFENDANTS (CONTINUED)

34. C/o Mark Williams - Guard - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

35. Sgt. Gwen Everette - Sergeant - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

36. Sgt. Michael Bryan - Sergeant - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

37. C/o Nicholas Mohr - Guard - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

38. C/o Della Boone - Guard - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

39. C/o Daynene Scott - Guard - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

40. Sgt. Bobbie Montgomery - Sergeant - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

41. IA Ed McGee - Internal Affairs Officer - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

42. IA Lester Boney - Internal Affairs Officer - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

43. Sgt. McGinnis - Sergeant - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

44. C/o Rebecca White - Guard - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

45. C/o Thomas Keefer - Guard - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

46. C/o Weber - Guard - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

47. Sgt. Angelina DeAllie - Sergeant - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

48. S/Lt. Chris Cessna - Staff Lieutenant - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

DEFENDANTS (CONTINUED)

49. Lt. Sennett - Lieutenant - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

50. C/o Charles Stevens - Guard - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

51. C/o Greg Turner - Guard - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

52. C/o William Morris - Guard - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

53. Cpl. Parsons - Corporal - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

54. Sgt. Steve Floyd - Sergeant - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

55. Lt. Daum - Lieutenant - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

56. Lt. Michael Trader - Lieutenant - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

57. Sgt. Orlando DeJesus - Sergeant - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

58. Chris Senato - Food Service Director - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

59. C/o Paul Surowicz - Guard - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

60. Correctional Medical Services - Health Contractor - James T. Vaughn Corr. Center
    1181 Paddock Road, Smyrna, DE 19977

61. Dr. Brown - Doctor - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

62. Dr. Dresoro - Doctor - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

63. Nurse Betty Bryant - Nurse Administrator - James T. Vaughn Correctional Center
    1181 Paddock Road, Smyrna, DE 19977

## IV. STATEMENT OF CLAIM

(State as briefly as possible the facts of your case. Describe how each defendant is involved, including dates and places. Do not give any legal arguments or cite any cases or statutes. Attach no more than three extra sheets of paper if necessary.)

④ On May 6, 2008, Plaintiff was transferred from his cell handcuffed in order to eat in the interview room. While going to the interview room, C/O Daynene Scott began to

1. argue with Plaintiff. When Plaintiff argued back at her, she became irate and pushed him violently away. Plaintiff told Lead Officer, Sgt. Gwen Everette, that he needed to speak to the Lt. because "he had just been violated." Instead both Sgt. Everette and C/O Daynene Scott left Plaintiff handcuffed behind his back and shackled to the table.

   When they returned to Interview Room ten minutes later, Sgt. Everette unhandcuffed Plaintiff so that he could eat with handcuffs in front. Plaintiff snatched the cuffs and told her "to get the Lt. because he had been violated." Sgt. Everette kept asking for the cuff key as Plaintiff tried to eat his lunch. When C/O Daynene Scott snatched Plaintiff's tray away from him, he threw juice in her face. C/O Daynene Scott then came around the table and started throwing punches at Plaintiff, who grabbed her in a head lock and applied pressure to her neck in order to subdue

2. her. While subduing her, he was sprayed with capstun twice by C/O Reynolds Hicks. After second burst of capstun, Plaintiff punched C/O Daynene Scott twice in her face before allowing C/O Hicks to rehandcuff him.

   Plaintiff was later stripped to his boxers by Lt. Satterfield, S/Lt. Hawkins, and Q.R.T. and placed in 24 hr. black box mechanical restraints. Plaintiff was also criminally charged and maliciously prosecuted for three counts of assault in a detention facility. He received no medical attention from Nurse Betty Bryant and Dr. Dresoro for this incident. He was also falsely accused of assaulting Sgt. Gwen Everette and Sgt. Bobbie Montgomery.

② On May 11, 2008, Plaintiff received a retaliatory beating by Q.R.T. and prison officials. This incident was instigated by Sgt. Wilfred Beckles, who refused to turn cell lights off in broad

3. daylight in order to provoke Plaintiff. When Plaintiff refused to return his tray, Capt. Guy Fowler ordered Lt. Satterfield and Q.R.T. to assault Plaintiff. Because Plaintiff was aware that Lt. Satterfield and Q.R.T. would attempt to "gas" him with mace, Plaintiff prepared himself with a mixture of urine and feces.

   When Lt. Satterfield began to mace Plaintiff through door flap, Plaintiff countered by throwing urine and feces on him. Q.R.T. then entered Plaintiff's cell and began to assault him as he threw urine and feces at them. During this incident, Plaintiff was punched and kicked by C/O Williams and Sgt. Foraker. He was also stabbed with sharp object in his foot area by Sgt. Cariello, which resulted in severe bleeding to his great right toe. He also suffered a severed split ear with outer ear separated down the middle toward eardrum. Lt. Satterfield allowed all officers to assault Plaintiff as an act of retaliation for throwing urine and feces. Plaintiff was later

## V. RELIEF maliciously prosecuted for six counts of assault in a detention facility.

(State briefly exactly what you want the Court to do for you. Make no legal arguments. Cite no cases or statutes.)

1. Injunctive Relief - 1)temporary and permanent injunction against Defendants who have either brutally assaulted Plaintiffs or have brought criminal charges against Plaintiffs in a court. 2)temporary and permanent injunction against Defendants who have used "NUTRALOAF" as punishment for disciplinary reasons that are not "food-related" and do not give a due process hearing. 3)temporary and permanent injunction against Defendants , who are Hearing Officers and violate due process and liberty interests by not giving fair hearings and right to call witnesses and confront accusers and using sentence enhancers for multiple minor offenses that are used to qualify for disciplinary isolation and loss of good time. Also, restoration of all loss of good time sanctions that violated due process. 4) Immediate transfer to another state facility with no contact order by named Defendants who have brutally assaulted Plaintiffs. Protective Order against Defendants

When Nurse Betty Bryant reluctantly was providing medical treatment to Plaintiff, she told Lt. Satterfield that Plaintiff needed to go to outside hospital because "Plaintiff likes to sue people." This was in reference to pending lawsuit 04-216 JJF in this court. Plaintiff was later maliciously prosecuted.

Plaintiff was transported to Kent General Hospital via Ambulance and given treatment. He received thirteen stitches for his split ear and was given a suture staple to attach the tendon to his right big toe that was almost detached. Even though attending physician at Kent General Hospital stated that Plaintiff should be placed in a sterile environment with chronic care at the Infirmary to prevent gangrene and possible toe amputation, both Warden Perry Phelps and Shift Commander Captain Rispoli, along with Dr. Brown of CMS Medical refused to send Plaintiff to the Infirmary to receive treatment. Instead, Captain Rispoli, Majors Castello and Scarborough, and Lt. Forbes and S/Lt. Karen Hawkins forced Plaintiff to sleep on an unsanitary floor with dirt and hair in the Observation barber Room. This caused further infection to his foot and ear area.

Approximately three or four days later, Plaintiff complained again about Staff leaving lights on during daytime hours. As a protest, he again held his styrofoam tray. Instead of following DOC policy and investigating the problem, Majors Castello and Scarborough ordered two squads of Q.R.T. to apprehend Plaintiff, who was still on intensive medical care for his recent sustained injuries of a severed ear and severed big toe. Lt. Satterfield and S/Lt. Hawkins ordered Plaintiff to be placed in 24 hr. hard "black-box" restraints even though previous policy stated that an inmate should only be placed in 24 hr. mechanical restraints if he had assaulted staff. 24 hr. mechanical restraints were always used as a punitive measure, but never before for a non-violent protest such as holding a paper or styrofoam tray.

③ In July, 2008, Sgt. Beckles and Lt. John Salas came to Plaintiff's cell after lunch for an impromptu shakedown even though Plaintiff was not

on isolation status; hence, not subject to mandatory shakedown. Plaintiff, who was not properly dressed in his boxers and T-shirt, kept asking why they wanted to shake him down. Sgt. Beckles responded that "they didn't need a reason, they could shake down anyone they wanted to." After asking several times, Plaintiff told them to come back after he was dressed. Sgt. Beckles ordered Plaintiff to cuff up now without being properly dressed. To that, Plaintiff responded that "if (Beckles) couldn't wait, then get the team." Sgt. Beckles then suddenly capstunned Plaintiff in the face with pepper spray with no warning or ultimatum. He and Lt. Salas, along with other tier officers, then left the tier to assemble the Q.R.T. team to further assault Plaintiff.

When Q.R.T. opened the cell door, Plaintiff lunged outside of the cell in order that other inmates could see the beating. During this time, Sgt. Bryan kicked Plaintiff while he was down on the floor and falsely accused him of resisting. Plaintiff was placed back in his cell and put on isolation status after committing no institutional infraction.

④ In August, 2008, Inmate Thomas Gordon "popped" his sprinkler to protest Lt. Neal's and Sgt. Beckles's confiscation of his food. Shift Commander Guy Fowler and Lt. Neal allowed Sgt. James Thomas, who was involved in an earlier assault with Gordon, to be placed on Q.R.T. as an act of retaliation. After Gordon complied with order to "cuff up," he was pushed into cell by Sgt. Beckles and Q.R.T. members. Gordon was then heard screaming that "Sgt. Beckles was hitting him in the head with a metal bar." As Gordon continued to scream and yell and threaten Sgt. Beckles for brutally assaulting him with metal pipe, Lt. Maggie Neal and C/O DeBerry were observed giggling and smiling as blood streamed down Gordon's face. Later, Gordon was placed in 24hr. restraints and repeatedly capstunned with mace by Sgt. Beckles. Gordon suffered severe

trauma and fracture to his nose and skull. For this brutal assault, Warden Phelps and IA Officers Lester Boney and Ed McGee took no disciplinary action or performed any investigation into the matter.

(5) On September 13, 2008, while working overtime at breakfast, Sgt. Beckles again assaulted Plaintiff with capstun after Plaintiff refused to give him his styrofoam try as an act of protest for Sgt. Beckles ordering staff to not give Plaintiff a carton of milk. When Lt. McCarty was notified about the incident, he filed a disciplinary 210 report against Sgt. Beckles for using unlawful force. When questioned by Lt. McCarty why he used mace against Plaintiff, Beckles replied that Lt. McCarty "needed to get with it." This implied that it was apropos for staff to assault inmates for disobeying their personal orders. Lt. McCarty did not agree and filed a 210 disciplinary infraction against Sgt. Beckles after getting Plaintiff to be seen by Medical nurse and having his eyes flushed due to irritation of chemical mace. Plaintiff also submitted a statement to the incident.

(6) On the next day, Sunday, September, 14, 2008, Sgt. Beckles was given permission by Shift Commander Guy Fowler and Lt. Salas to instigate an assault against Plaintiff. Because Shift Commander knew that Plaintiff would strike out at Beckles for previous assault, Administrators decided to use Plaintiff's failure to comply with orders to have Sgt. Beckles around him as an excuse and impetus to assault him. Administrators justified this action by using the mantra that "inmates can not dictate whether staff works in their area or have direct contact with them." This became the slogan of Warden Phelps, Deputy Wardens, Majors, Shift Commanders, Unit Managers and Lieutenants in their zeal to "get Dickens at all costs, even severe injury and eventual death.

After informing both Sgt. Beckles and Lt. Salas that I had "something" prepared for Sgt. Beckles, Shift Commander Guy Fowler directed Lt. Salas to "kick

5

Plaintiff's ass." Sgt. Beckles was given permission to begin assault a-
gainst Plaintiff by spraying capstun into Plaintiff's cell in order to
burn his eyes and lungs and choke him. Plaintiff began to throw
urine in order to defend himself against assault.

When O.R.T. arrived, O.R.T. staff immediately began to beat and kick
Plaintiff as they wrestled him to the floor. Plaintiff then felt this
sharp pain to his ankles, which he later learned was a beating of
a broom handle by Sgt. Angelina DeAllie. He then felt several hard
blows to the back of his head from a metal pipe. Plaintiff yelled
that Sgt. Beckles was beating him with a bar. Plaintiff was trans-
ported to the Infirmary and put on suicide watch as punishment,
which is typical at JTVCC. While there, he was treated for cuts
and lacerations to the back of his skull and was given an X-ray,
which revealed a fractured ankle.

While in the Infirmary, Plaintiff spoke directly to Warden Phelps
about Sgt. Beckles's beating of him and Inmate Thomas Gordon with
metal pipe bar, resulting in fractures and cuts to their skulls. When
asked what Warden Phelps was going to do about it, he told Plain-
tiff "to be patient." Instead of ordering an investigation into the
metal bar beatings by Sgt. Beckles, Warden Phelps and Deputy Warden
Pierce gave Sgt. Beckles a "slap on the wrist" for using unauthorized
use of force of capstun mace against Plaintiff for previous 210
report by Lt. McCarthy. For this, his "punishment" was mere removal
of Sgt. Beckles as Bldg. Sgt. However, he was permitted to continue
retaliating against Plaintiff, Thomas Gordon, and other inmates by con-
tinuing to be allowed to have contact and direct supervision over
them.

(7)  On January 2, 2009, Inmates Roman Shankaras and Thomas Gordon decided to protest onerous and hazardous conditions in SHU isolation. They asked to speak to S/Lt. Hawkins or the Captain or Major about getting their cells and tier clean and a SHU isolation rule book about personal property and items allowed. Major Scarborough and S/Lt. Hawkins came down to speak to Inmates Shankaras and Gordon after they climbed the fences and refused to come out of recreation yard. Despite the "Spiderman" protest of Shankaras and Gordon, Major Scarborough and S/Lt. Hawkins refused to give them cleaning supplies to clean their cells or the SHU Rulebook for isolation, Major Scarborough and Captain Fowler then made the decision to get Q.R.T. and C.E.R.T. "gunman" to shoot Inmates Shankaras and Gordon down, along with shock shield.

After Inmates Shankaras and Gordon refused to come out of the yard, (then Lt.) Orlando DeJesus shot over one hundred mace pellets at Gordon, who was 12-15 feet above floor. The only cushion to protect Gordon's fall was a four inch vinyl and foam mattress, DeJesus then shot over fifty mace pellets at Shankaras before Shankaras finally came down from fence. This resulted in severe bruises, cuts, and lacerations to their backs and shoulder areas that have left permanent scar tissue.

(8)  Later that night, Inmate Devon Mills decided to protest the conditions in SHU by refusing to come out of the recreation yard. For this protest, Captain Rispoli ordered Q.R.T. to shock him with shock shield and strip him totally naked before throwing him back into isolation cell.

(9)  When dinner was served, c/o's Rebecca White, Weber, and Thomas Keefer decided to retaliate against certain inmates by "playing" with their food. Plaintiff's tray was missing his dessert, cornbread, and

a spork. Inmate Devon Mills's tray was missing cornbread also. Another inmate, Robert Ashley, was not fed. Meanwhile, both Inmates Sham-karas and Gordon received extra tray and extra food.

When Plaintiff held his tray in order to protest tampering of tray by officers White and Weber, Lt. Furman came down and threatened Plaintiff with Q.R.T. Instead of acquiring more food from the kitchen, Plaintiff was assaulted by shock shield and suffered burns to his chest and upper torso. He was stripped down to his T-shirt and boxers and thrown back into his isolation cell. He received no medical treatment or attention for his burns to his chest and upper torso. The order to assault Plaintiff by Q.R.T. was made by Captain Rispoli.

Later, when Lt. Trader and c/o's White, Weber, and Keefer came to Plaintiff's cell to return mattress that had been confiscated for earlier incident, he confronted c/o White about tampering with his food. At this point, neither Lt. Trador nor any other officer ordered Plaintiff to return to his cell. Instead, both c/o Weber and c/o Keefer took an aggressive boxing stance by putting up their fists. When they approached Plaintiff, c/o Weber threw a punch that struck Plaintiff as Plaintiff simultaneously struck c/o Keefer.

Lt. Trader then told officers to get their capstun mace. When c/o White went for her mace, Plaintiff tackled her as they both fell into alcove area. As Plaintiff attempted to subdue c/o White from macing him, c/o Keefer and c/o Weber grabbed Plaintiff. Plaintiff was punched and kicked by Cpl. McGinnis, Lt. Trader, and c/o Weber as c/o Keefer pulled Plaintiff away by twisting his arm to handcuff him. Plaintiff was then sprayed with capstun and kicked in his head by c/o Weber before he released c/o White, who he was holding by her hair. Plaintiff

(9)  In March, 2009, while escorting Plaintiff to a legal visit, Plaintiff complained to Lt. Smith about c/o Della Boone and other SHU 18 officers tampering with his food by maliciously opening his tray and putting things in his food before he received it. C/o Della Boone then lied and claimed that "it came from the kitchen like that." When Plaintiff called her a liar, she pulled out her mace and a metal pipe bar and threatened to strike Plaintiff with Lt. Smith not saying a word. Plaintiff then warned her that if she came to his door or flap the next day that "he would have something for her" as a result of her earlier threat.

On the next day, instead of removing c/o Della Boone from Plaintiff's working area, Captain Rispoli and Majors Scarborough and Costello, along with S/Lt. Hawkins and Lt. Smith, ordered Q.R.T. to escort Plaintiff from his cell as part of their "get Dickens" campaign. This was done as part of intimidation tactics that became routine whenever Plaintiff had an ongoing problem with staff.

Later, c/o Della Boone brought food tray to Plaintiff's flap defiantly after being warned not to come around him the previous day. Once again, she had tampered with his tray and contaminated it so that it was inedible. As a result, Plaintiff threw tray at c/o Della Boone as she gave him a mocking smirk. The tray and the contaminated food hit c/o Reynolds Hicks, who was near the flap accidentally and Plaintiff immediately apologized to c/o Hicks, as c/o Della Boone walked away laughing.

(10)  Because Plaintiff followed through on his earlier threat, JTVCC staff then decided to put their plot into high gear. This plot was meant to physically and mentally destroy Plaintiff and to prevent his release from prison by having the courts to de-

9

again received no medical attention or treatment by Nurse Lorraine Walpole as S/Lt. Willey ordered that she only check 24 hour black box restraints instead of being treated for capstun mace and burning to eyes, face and mouth or the swelling in the back of his head due to punches and kicks. He was also was sexually assaulted by Q.R.T. member, who gratuitously fondled his genitals as he was escorted back to his cell.

Immediately after this incident, Commissioner Danberg, Deputy Commissioner Thomas Carroll, Bureau Chief Rick Kearney, Warden Perry Phelps, Deputy Warden Pierce, Deputy Warden Klein, Major Scarborough, Major Costello, Captain Rispoli, and S/Lt. Hawkins all began a conspiracy to harm and injure Plaintiff. The need for extreme punishment to "get Dickens" was made more urgent by the fact that Plaintiff had assaulted a white female guard who was involved in several sexual relationships with male staff and administration.

As punishment, Plaintiff was placed in 24hr. black box mechanical restraints with no opportunity to free hands for eating or using the bathroom. S/Lt. Hawkins and both Majors, along with Captain Rispoli, also ordered Plaintiff to be put on strip cell status, where he was forced to sleep on empty bunk and floor without mattress for ten days. This was meant to cause Plaintiff back pain and hemorrhoids, which prison administrators were aware of.

Major Scarborough and Captain Rispoli then ordered Plaintiff to be "escorted" by Q.R.T. squad as a precaution whenever he left his cell. This was done to intimidate Plaintiff and instigate an incident in order to justify an assault against Plaintiff. During this time, prison security recruited Q.R.T. members who personally were having sexual relations with Plaintiff's alleged victims as a way to retaliate and act revenge.

clare him an habitual offender.

First, Major Scarborough and Major Costello, Captain Rispoli, and S/Lt. Hawkins ordered that Plaintiff would be denied his constitutional right to exercise and have recreation for one hour three times per week. There was no reason given for this punishment. It was just done arbitrarily in order to damage Plaintiff's mental and physical health. This denial of exercise as punishment continued for three months until June, 2009.

When S/Lt. Willey, Lt. Cessna, and Sgt. Sennett informed Plaintiff of this "Dickens" rule, he was told that he would only be permitted a fifteen minute shower three times per week. He then asked Sgt. Sennett and Lt. Cessna for his towel and soap and clean clothes in order to shower. These were never given to him, and Lt. Cessna told him that his time was up. When Plaintiff refused to come out of the shower, Captain Fowler ordered K-9 dog, Q.R.T. team, and pepper ball gun and threatened Plaintiff with bodily harm. Plaintiff returned to his cell after being denied his shower.

Second, Plaintiff was constructively starved by the conspiracy of CMS staff, Dr. Brown, Dr. Deesoro, Nurse Betty Bryant, Food Service Director Chris Senato and JTVCC staff, who ordered that he be repeatedly placed on the "NUTRALOAF" for five weeks straight. This punishment was due to throwing food and storing feces in his cell. The purpose was to destroy Plaintiff's body and immune system in order to eventually kill him. As Plaintiff continued to lose over 25% of his body weight rapidly, JTVCC and CMS staff commented sadistically about his weight loss as his health continued to decline. Even after Dr. Dresoro recommended that Plaintiff be given regular meals, Deputy Warden Klein still refused to take Plaintiff off "NUTRALOAF" because his sanction was not over. It was only after a low blood pressure

no iron in blood content, and persistent and frequent "blackouts" that JTVCC staff finally relented and began to feed Plaintiff properly. By this time, Plaintiff's weight had dropped over 60 pounds in a little over one month.

Third, Major Costello and Captain Rispoli designed a military torture tactic against Plaintiff commonly referred to as RES (Reduced Environmental Stimulation). This is a psychological warfare tactic that is meant to cause mental psychosis to a person by not allowing him to be aware of his environment and to be "boxed in." This was done to Plaintiff by covering his windows with a dark tinted covering that did not permit him to see outside of his cell, while allowing officers and staff to inspect him from outside. This was designed to cause Plaintiff literally to not know "the time of day" or be in touch with his surroundings in order to cause severe psychological injury.

Finally, in order to justify an assault against Plaintiff, Captain Rispoli ordered Lts. and staff to initiate physical contact with Plaintiff. Initially, it began as mere touching or holding Plaintiff's arms and wrists while handcuffed. It then escalated into grabbing and yanking on Plaintiff while handcuffed in order to cause injury.

(11) In March, 2009, Sgt. Michael Bryan, who had a notorious reputation for assaulting prisoners while handcuffed, slammed Plaintiff into the wall as he was talking to Lt. Daum. Lt. Daum did not intervene or try to protect Plaintiff during incident. As a result of Sgt. Bryan slamming him into wall while handcuffed, Plaintiff demanded that Sgt. Bryan not be allowed to handcuff him any more.

As part of the "get Dickens" campaign in its zeal to failure to protect Plaintiff from abuse, Majors Scarborough and Costello,

were deliberately indifferent to his plight after making complaints
writing letters and filing numerous grievances, he decided to take
matters into his own hands.

(12)    On March 28, 2009, when Sgt. Bryan and C/o Nicholas Mohr approached
Plaintiff's cell, Plaintiff threw combination of urine and feces on
them. Lt. Smith then assembled Q.R.T. to assault Plaintiff. During
this incident, C/o William Morris shocked Plaintiff with 50,000 volt
electric shield while Sgt. Beckles snapped his ring finger and broke
it before cuffing him.

    After the Q.R.T. assault on Plaintiff, Sgt. Bryan waited outside
in the hallway and was allowed to grab and spit on Plaintiff and
threaten him with bodily harm as Sgt. Bryan stated that "he was
going to do jail time for Plaintiff." Nurse Quannie Cain witnessed
this incident and in cohorts with JTVCC "get Dickens" policy, she
refused to report it or to intervene on Plaintiff's behalf. Lt. Smith
also watched passively while Sgt. Bryan ranted on like a maniac.
Plaintiff received no medical treatment for his injuries, as his
broken finger was never set by CMS staff, leaving the finger perma-
nently disfigured.

(13)    On April 15, 2009, Captain Rispoli sent Lt. Harvey and Sgt. Bryan
to Plaintiff's cell and ordered that he allow Sgt. Bryan to hand-
cuff him as part of "get Dickens" policy of retaliation. As soon
as Plaintiff refused, Sgt. Bryan immediately joined Q.R.T. team as
the No.1 shield person to make initial contact with Plaintiff. Plain-
tiff prepared himself for imminent assault by Sgt. Bryan and Q.R.T.
by spreading feces on his arms and hands.

    When Sgt. Bryan attacked Plaintiff, Plaintiff grabbed him in a
headlock as C/o Charles Stevens, C/o Greg Turner, and C/o Daynene Scott

and Captain Rispoli ordered that Plaintiff allow Sgt. Bryan to hand-cuff him despite earlier assault by Sgt. Bryan. When Plaintiff re-fused to allow Sgt. Bryan to handcuff him while escorting him from his cell, Lts. Harvey, Daum, Smith, and Baynard would fabricate incident and disciplinary reports by stating that Plaintiff "refused to be handcuffed" or "refused to be shook down." All SHU staff knew that this was not true, and Plaintiff only requested that another officer be allowed to handcuff him in order to protect his safety.

Whenever Plaintiff refused to allow Sgt. Bryan to handcuff him, Plaintiff would spread feces on his arms and wrists in order to deter Sgt. Bryan from touching him. This resulted in Q.R.T. team being assembled repeatedly to punish Plaintiff by placing him in 24 hr. restraints. After this tactic failed to deter Sgt. Bryan and JTVCC administration from harming Plaintiff, Sgt. Bryan was allowed to repeatedly volunteer on Q.R.T. squad after initiating incident with Plaintiff as a form of retaliation.

On two other occasions in late March, Plaintiff was slammed to the floor by Sgt. Bryan as Lt. Harvey and Lt. Baynard oversaw the inci-dent with approval. They then conspired to lie and state that Plain-tiff was resisting Sgt. Bryan and tried to assault him while hand-cuffed. On one occasion, Sgt. Beckles was allowed to join Q.R.T. team and "thumb" Plaintiff in his eye in order to cause injury as part of staff retaliation. C/o Daynene Scott also was part of Q.R.T. retalia-tion team against Plaintiff.

When A.I.U. became clear that Plaintiff was going to be sever-ely injured each time that Sgt. Bryan worked in his area and all JTVCC staff, including Warden Phelps, Deputy Wardens Pierce and Klein, Internal Affairs, Commissioner, and all senior administrators

punched Plaintiff. Sgt. Bryan later kicked Plaintiff while he was down on the floor and defenseless. Plaintiff was then transferred to the Observation Room in order to placed in 24 hr. restraints.

As c/o Greg Turner was placing the black box and cuffs on Plaintiff, Lt. Harvey allowed Sgt. Bryan to rejoin the team and snatch the cuffs and black box from c/o Turner. He then threw a solid punch to Plaintiff's head after he put the handcuffs on, causing swelling to Plaintiff's forehead as Lt. Harvey looked on, approvingly.

After punching Plaintiff in the forehead, Sgt. Bryan got into a heated argument in Bldg. 20 with c/o Charles Stevens, who told him to "never do that shit again while he is on the team." Sgt. Bryan then cursed at him and threatened to fight with c/o Stevens, as staff had to separate them. Seeing the writing on the wall, that he was going to be terminated, Sgt. Bryan filed criminal assault charges against Plaintiff and maliciously prosecuted him. He also filed fraudulent Workmen's Compensation claim and was able to malinger a neck injury for over a year. At the end of the malingering of one year on Workmen's Compensation, as expected, but belatedly, Sgt. Bryan was finally terminated.

(14) On April 21, 2009, Sgt. Stanford Henry decided to pick up where Sgt. Bryan left off. When Plaintiff came out of his cell for his shower, Sgt. Henry began to yank on Plaintiff's cuffs from behind as he was cuffed and shackled. When Plaintiff protested to Lt. Baynard about Sgt. Henry impeding his progress and endangering his safety, Lt. Baynard approved of Sgt. Henry's tactics. At one point, Sgt. Henry threatened to pull Plaintiff down the stairs while Plaintiff was attempting to walk upstairs, while shackled, to the shower.

After this threat, Plaintiff informed Lt. Baynard that he would

need to use Q.R.T. to cuff him because he was not going to allow Sgt. Henry to cuff him. This demand was made at 9:30 A.M. As part of the "get Dickens" policy, Lt. Baynard refused to call Q.R.T. or Shift Commander because he did not want Plaintiff to "dictate" policy. He and Captain Rispoli then arrived with Q.R.T. approximately 2:30 P.M. as they spitefully left Plaintiff in the shower for five hours without feeding him or allowing him to use the bathroom.

In a further act of spite, they allowed Sgt. Henry to step to the front and cuff Plaintiff, instead of No.2 Q.R.T. man, which is standard operating procedure (SOP). As soon as Sgt. Henry cuffed Plaintiff, he again grabbed Plaintiff's wrists and threw Plaintiff into the shower door. This was done to create a false impression that Plaintiff was being combative.

Upon seeing Plaintiff thrown into the shower door, Q.R.T. No. 1 man, C/o William Morris, proceeded to apply 50,000 volt shock to Plaintiff in wet shower, creating a dangerous and possibly fatal situation as Plaintiff screamed out to other inmates on the tier that they were shocking him while handcuffed. After being shocked, Captain Rispoli came to Plaintiff's cell and took him to see Nurse Betty Bryant, who nonchalantly told Q.R.T. and staff that "Plaintiff looked all right to her." She never took any pulse or vitals on Plaintiff to see whether the voltage had caused any damage. Captain Rispoli then told Plaintiff that he "had ordered the action and that if [Plaintiff] wanted to get mad at anyone, then get mad at me." He then left the tier, as he laughed and joked and slapped Sgt. Henry on the back.

As part of the "get Dickens" policy, Warden Phelps, both Majors, and all Captains and Lts. were notified that "Dickens can not dictate

policy or who cuffs him" and to assemble Q.R.T. to assault Plaintiff whenever he refused to allow a particular guard to handcuff him. This continued for the next few weeks as Captain Rispoli left memos for his relief Shift Commanders to assemble Q.R.T. to assault Plaintiff for refusing to allow any particular guard to handcuff him. Captain Hazzard and Captain Henry continued this policy.

Later, Captain Rispoli, with approval of both Majors, ordered Area Lts. to initiate assault against Plaintiff whenever he refused a verbal order. In the last part of April, Plaintiff was sprayed with mace by Lt. Harvey for not pushing out his mattress and getting down on his knees while cuffed in shackled in 24 hr. restraints. A person in 24 hr. restraints can not offer any physical resistance whatsoever.

This policy continued whenever Lt. Harvey or Lt. Smith would come to Plaintiff's cell with Sgt. Henry to handcuff Plaintiff. Both Lt. Harvey and Lt. Smith, and sometimes Sgt. Henry, would initiate the assault by spraying mace in Plaintiff's face through the cell flap. Then Q.R.T. would be called to "finish the job" against Plaintiff.

(15)   On one occasion in late April, 2009, Lt. Harvey allowed Sgt. Henry to come into Plaintiff's cell after Q.R.T. had gotten Plaintiff on floor and stomp him on his head, causing cut and contusions and swelling to the back and side of his head. C/o Mohr and C/o Morris were also part of the Q.R.T. assault, along with C/o Daynene Scott, as part of retaliation against Plaintiff.

(16)   On the second occasion in date April, 2009, Lt. Smith and Sgt. Henry initiated the assault against Plaintiff by spraying mace in Plaintiff's face and cell for Plaintiff's refusal to allow Sgt. Henry to handcuff him. Once again, Q.R.T. "finished the job" on Plaintiff by having

Cpl. Parsons punch Plaintiff after c/o William Morris knocked Plaintiff to the floor, Sgt. Henry, who was never part of Q.R.T. team, then came in and stomped Plaintiff in his face and head. This caused a large "golf ball" sized knot on Plaintiff's left eye as officers came from all over the SHU complex to gawk at and mock Plaintiff. During this incident, a picture was taken of Plaintiff's injury and was prominently displayed in a cartoonish fashion by Lt. Smith and Lt. Daum and S/Lt. Hawkins. Captain Henry later came down and ordered Lt. Smith and Lt. Daum to take picture down after Inmate Kevin Braithewaite complained about the mocking and inappropriate sideshow.

At this point, Plaintiff recognized that the administration's plot and ploy was to literally "wear Plaintiff out." This "game" became one where the agenda of Shift Commander and SHU Lts. were to provoke an incident and assault against Plaintiff as part of their schedules, sometimes the first task of the day. At least two or three times per week, SHU staff and Q.R.T. would assault Plaintiff and cause him injury. The assaults, combined with lack of medical care, and lack of edible food, were slowly deteriorating Plaintiff's physical health to the point that his body temperature and blood pressure had become morbidly low.

It was after this last assault on May, 2009, in SHU ISO that Plaintiff chose to remain in 24 hr. restraints for an additional 24 hours to protest the repeated assaults and repetitive transfers to Observation Room. Captain Rispoli then came down to SHU Bldg. to inform Plaintiff that "he was the one behind the incidents, and to get mad at him if Plaintiff wanted to be mad at anyone." He then assured Plaintiff that no one would be grabbing or yanking him as he walked to his cell.

(17)    On May 6, 2010, Sgt. Floyd, S/Lt. Hawkins, and Lt. Baynard confiscated Plaintiff's personal television without any disciplinary report. When they would not return his television to him, he snatched cuffs and cuff key from Sgt. Floyd and would not return them until the return of his TV, which was taken as a spiteful _ex post facto_ rule that he could not have a TV on Level I, when the rule at the time that he bought the TV was that inmates on Level I could possess TVs.

   Lt. Baynard and Captain Rispoli then ordered Q.R.T. to assault Plaintiff, with Lt. Baynard initiating the assault by spraying mace in Plaintiff's cell. Unbeknownst to Plaintiff at the time, Sgt. Henry, Lt. Baynard, and Sgt. Floyd had conspired to confiscate Plaintiff's TV earlier in the week as Sgt. Henry later boasted that "he worked overtime on Thursday so that he would not miss this."

   When Q.R.T. came to Plaintiff's cell, he flushed cuff key before C/o Morris knocked him to the floor with shock shield. Once again, Sgt. Henry came into Plaintiff's cell and immediately began stomping him before placing cuffs on him. Even though it is standard practice for Q.R.T. to assault prisoners as part of their training, it is usually done before a prisoner is placed in handcuffs and shackles. What was unusual about Lt. Baynard is that he allowed the brunt of the beating of Plaintiff after Plaintiff was subdued, while hand-cuffed and shackled.

   As Plaintiff was being transferred to Bldg 18 ISO, he was slammed repeatedly in the walls and sliding doors by Q.R.T. as Lt. Baynard encouraged them. At one point, it was done right outside S/Lt. Hawkins's office as she refused to intervene. The slamming of Plain-tiff's head and face got worse in Bldg. 18 as C/o William Morris, Sgt. Floyd and Sgt. Henry picked Plaintiff up and slammed his head

on laundry cart and hard metal table. Finally, he was slammed on his head outside Nurse Betty Bryant's office, with her enjoying the brutality, as he bled profusely from his busted eye, that was later stitched up by medical staff. Plaintiff was then transported by ambulance to Kent General Hospital for concussion symptoms and fractured shoulder. The impact and force used to fracture Plaintiff's shoulder caused the attendant physician to comment that he had only seen that type of injury one other time. That was at a NASCAR race when the driver hit the wall at 200 miles per hour.

2. Unspecified Monetary and Punitive Damages against Defendants and Declaratory Judgment against Defendants who brutally assaulted or were deliberately indifferent to Defendant's complaints about assaults and cruel and unusual punishment under Eighth and Fourteenth Amendments. Denial of Medical Care, Denial of Exercise, Denial of Food, Clothing

3. Unspecified Monetary and Punitive Damages against Defendants for retaliation for filing complaints and grievances and lawsuits under First Amendment. Destruction and Confiscation of Legal Property and Personal Property under Sixth Amendment and Fourteenth Amendment. Lack of Due Process under Disciplinary Procedure and Grievance Procedure and Punishment Before a Hearing Reimbursement of Restitution Sanctions that Lacked Due Process.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _12th_ day of _September_, 2 0 1 0.

_Kevin L. Dickens_
(Signature of Plaintiff 1)

_Roman Shankaras_
(Signature of Plaintiff 2)

_Thomas Jordon_
(Signature of Plaintiff 3)

4

